1
2
3
4
5
6
7
8          IN THE UNITED STATES DISTRICT COURT FOR THE
9                    EASTERN DISTRICT OF CALIFORNIA
10
11   CURTIS JAMELL MEEKS,                    2:06-cv-01509-RCT
12              Petitioner,
13        vs.
14   M. MCDONALD, et al.,
15              Respondents.
                                            MEMORANDUM DECISION
16   _____/      AND ORDER
17
18        This matter comes before the Court on Curtis Jamell Meeks's petition for a writ of
19   habeas corpus pursuant to 28 U.S.C. § 2254.
20                               INTRODUCTION
21        Petitioner Meeks is a state prisoner currently incarcerated at High Desert State Prison in
22   Susanville, California.[1]  He filed this petition for a writ of habeas corpus to challenge a
23   judgment of conviction entered against him in the Solano County Superior Court in 2004 on
24   multiple counts of assault, torture, and false imprisonment.  A review of the record shows that
25   one of Meeks's claims is procedurally barred, and that the California Court of Appeal, First
26   Appellate District, correctly applied United States Supreme Court law in rejecting the two
27
28
─────────────────
        [1]  Pursuant to the change in wardens at High Desert State Prison, the Clerk is directed to
change the case caption from T. Felker to M. McDonald.

1    remaining claims presented in the petition.  *Id.* § 2254(d).  Accordingly, the petition is

2    dismissed in part and denied in part, and the case is dismissed with prejudice.

3                         <u>PROCEDURAL AND FACTUAL HISTORY</u>

4         The Solano County Superior Court convictions resulted in a sentence of three

5    consecutive life terms plus a determinate term of twelve years and eight months in prison.

6         The California Court of Appeal summarized the facts of this case as follows:

7         The crimes occurred on the nights of November 20 and 21, 2003, at a
     motel in Fairfield where defendant was living with J.F. and their son.  J.F.
8    testified as follows:
          She and defendant had been in a relationship for about six years.  In June
9    and August of 2002, when they were living in the state of Washington, J.F. had
     to call the police because defendant assaulted her.  In the first incident he hit her
10   in the leg with a wet towel; in the second incident he hit her in the face.
          On November 20, 2003, defendant became angry with J.F. because he
11   thought she was cheating on him.  He started choking her when she was putting
     their son to sleep because he thought she was ignoring him, and then threatened
12   to hit her with the bar from a towel rack in the bathroom.  He then told her to
     take her pants off, took a metal hanger from the closet, straightened it out, heated
13   it with a lighter, and whacked her on the legs with it 20 times, leaving burn
     marks on her thighs.
14        Defendant became angry with J.F. the next night after J.F. objected to
     him going out to a club with another woman.  He threw her on the bed, held her
15   down, and choked her for hours.  She could not breathe, foamed at the mouth,
     and kept blacking out.  Defendant stopped choking her for a moment when their
16   son got on the bed and asked him to stop.  Defendant pushed the boy off the bed
     and ordered him to go into the bathroom.  J.F. kept saying that she was sorry,
17   telling defendant that she loved him, and asking him to stop, but he kept choking
     her, "smiling at times," and saying to her at one point, "'[t]his is what love will
18   do.'"
          Defendant eventually ordered J.F. into the bathroom.  She tried to leave
19   the motel room, but he told her not to go and pushed her back in.  Inside the
     bathroom defendant continued choking her, and ordered her into the shower.  By
20   that point another person had come into the hotel room, a man named "Greg"
     whom J.F. had never seen before; defendant choked J.F. a couple of times in
21   front of Greg.  While J.F. was in the bathroom defendant put a towel over her
     head, hit her head on the wall, pushed her onto the toilet seat, and snuffed out a
22   burning cigar on her neck.
          Greg asked defendant to leave, and told him that he "would do the rest."
23   After defendant left the motel room, Greg told J.F., "'You need to leave.  This
     guy is going to kill you.'"  Greg did not want to call the police because he was on
24   parole and afraid of being arrested.  He helped J.F. to his car and drove her to his
     girlfriend Feoma's house.  Feoma called the police and took J.F. to the hospital.
25        J.F. was examined at the hospital in the early morning hours of
     November 22, 2003, by Dr. Stephen Backman, the other witness for the
26   prosecution in the case.  Backman observed burn marks on J.F.'s neck and
     thighs, and choke marks on her neck.  Choking was further evidenced by the
27   broken blood vessels on her face, and the bleeding beneath her eyes.  It appeared
     to Backman that J.F. "was pretty close to being choked to death, about as close
28   as you can be without dying."

                                    -2-

Backman's report of the examination was admitted into evidence, along with photos showing J.F.'s injuries as they appeared when Backman examined her, and two weeks later.

The defense rested without putting on evidence.  J.F. admitted that, when she was first questioned by the police, she did not say anything about Greg and gave a different account of how she got to the hospital.  She said that she did not initially mention Greg because he had asked her not to tell the police about him, she did not know him, and did not know what he was capable of doing.  She said that she was afraid to leave the motel room after the incident the first night, but admitted that she had left defendant, and taken her son with her, in the past.  She admitted that defendant had frequently been unfaithful to her and that his infidelities had been a problem in their relationship, but she denied falsely accusing him of causing her injuries because she thought he was cheating on her.  The defense argued to the jury, citing J.F.'s inconsistent statements to the police, her failure to leave defendant after the first night, her failure to call the police the second night, and the lack of physical evidence from the motel room, that J.F. was framing defendant for something someone else had done.

(Lodged Doc. E at 2–3 (alteration in original).)

Based on the incident with the heated wire hanger on November 20, 2003, the Solano County jury convicted Meeks of assault with a deadly weapon in violation of California Penal Code section 245(a)(1) (count I) and of torture in violation of section 206 (count II).  Based on the choking incident on November 21, 2003, the jury convicted Meeks of assault by force likely to produce great bodily injury in violation of section 245(a)(1) (count III) and of torture in violation of section 206 (count IV).  Based on the lit cigar incident on November 21, 2003, the jury convicted Meeks of the lesser included crime of misdemeanor assault in violation of section 240 (count V) and, again, of torture in violation of section 206 (count VI).  As to counts I–IV and VI, the jury further found pursuant to section 12022.7(e) that Meeks had personally inflicted great bodily injury upon his victim under circumstances involving domestic violence.  Finally, the jury also convicted Meeks of false imprisonment in violation of section 236 (count VIII), but found him not guilty of child abuse under section 273a(a) (count VII).

The trial court sentenced Meeks to life imprisonment on each of the torture counts (counts II, IV, and VI).  (Lodged Doc. A2 at 367.)  It sentenced Meeks to three years imprisonment on count I, one year imprisonment on count III, and eight months imprisonment on count VIII.  (*Id.*)  The trial court further imposed an additional four-year enhancement for each finding of great bodily injury (counts I–IV and VI).  (*Id.*)  However, it stayed sentencing on count V.  (*Id.*)  As all of these terms are to run consecutively, in the aggregate the trial court

1   initially sentenced Meeks to three consecutive life terms plus a determinate term of twenty-four

2   years and eight months in prison.

3   In an unpublished decision, the California Court of Appeal affirmed the superior court's

4   judgment on March 17, 2006. (Lodged Doc. E at 12.) However, it ordered the sentences

5   imposed for the offenses and enhancements on counts I and III stayed under California Penal

6   Code section 654, which prohibits multiple punishment for a single act. (*Id.*) The effect of this

7   judgment is to decrease Meeks's determinate sentence by twelve years, for a final aggregate

8   sentence of three consecutive life terms plus a determinate term of twelve years and eight

9   months in prison. Meeks thereafter filed a petition for review in the California Supreme Court,

10  which was denied on May 24, 2006, without comment or citation to authority. (Lodged Doc.

11  G.)

12  On July 7, 2006, Meeks filed this federal petition for a writ of habeas corpus.

13  Respondents concede that Meeks's claims have been fully exhausted, but argue that only two

14  are properly before this Court.

15  <u>CLAIMS</u>

16  Meeks raises the following claims in his petition:

17  1. Denial of effective assistance of counsel because his attorney: (a) failed to read and

18  introduce into evidence love letters written by J.F. to Meeks; and (b) failed to move to reopen

19  the case after Meeks indicated, at a *Marsden* hearing during jury deliberations, that he wanted

20  to testify.

21  2. Denial of his right to confront the witnesses against him based on Meeks's alleged

22  inability to see J.F. during her trial testimony.

23  3. Violation of his right to due process based on insufficient evidence supporting great

24  bodily injury as an element of counts I, II, and VI and their enhancements.

25  <u>LEGAL STANDARD</u>

26  In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

27  ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which established that a

28  federal habeas corpus petition shall not be granted with respect to any claim adjudicated on the

merits in the state courts unless the adjudication either: (1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the United States Supreme Court; or (2) resulted in a decision that was based on

an unreasonable determination of the facts in light of the evidence presented to the state courts.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by [the Supreme Court]
> on a question of law or if the state court decides a case differently than [the
> Supreme Court] has on a set of materially indistinguishable facts.

*Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  "Under the 'unreasonable application' clause,

a federal habeas court may grant the writ if the state court identifies the correct governing legal

principle from [the Supreme Court]'s decisions but unreasonably applies that principle to the

facts of the prisoner's case." *Id.* at 413.

Under AEDPA, the federal courts review the "last reasoned decision" of the state courts.

*Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).  Because the California Supreme Court denied

Meeks's petition for review without comment or citation to authority, the Court will here review

the decision of the California Court of Appeal.

DISCUSSION

I.    *Ineffective Assistance of Counsel*

Meeks claims that he suffered ineffective assistance of counsel because his attorney

failed to introduce J.F.'s love letters and failed to move to reopen the case upon learning that

Meeks wanted to testify.  The trial court, in evaluating Meeks's motion for a new trial, found no

merit to these arguments.  (*See* Lodged Doc. C5 at 73–74.)  The California Court of Appeal

reached the same conclusion on direct review.  (Lodged Doc. E at 4–8.)

A.    *Legal Standard*

Clearly established federal law guides the Court's examination of ineffective assistance

of counsel claims.  *Delgado v. Lewis*, 223 F.3d 976, 980 (9th Cir. 2000).  Specifically, in order

to establish ineffective assistance, a petitioner must show that counsel's representation fell

below an objective standard of reasonableness and that the deficient performance affected the

result of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. A reasonable tactical decision by counsel with which the defendant disagrees cannot form a basis for an ineffective assistance of counsel claim. *See id.* at 689–90. In order to demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Supreme Court defines "a reasonable probability" as a "probability sufficient to undermine confidence in the outcome." *Id.*

Moreover, federal habeas review of an ineffective assistance of counsel claim is "doubly deferential" under AEDPA. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam). "If a state court has already rejected an ineffective-assistance claim, a federal court may [only] grant habeas relief if the decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* at 5 (quoting 28 U.S.C. § 2254(d)(1)).

B.    *Love Letters*

Meeks claims that he suffered ineffective assistance of counsel because his attorney failed to read and then use the contents of love letters written to Meeks by J.F. Meeks argues that his only path to demonstrating reasonable doubt "was to build a claim that J.F. was so deranged by bitterness and jealousy that she could be motivated to frame him," and that the letters constitute proof of J.F.'s "intense jealous[]y." For good measure, Meeks argues also that the letters establish J.F.'s "taste for arguably masochistic sexual practices."

On direct review, the California Court of Appeal rejected Meeks's argument. It first accurately described the background to this claim as follows:

> At the hearing on the new trial motion, defendant's trial counsel testified that he found the letters in his office one day, thought defendant's mother had dropped them off, and did not read them other than to find out what they were and who had written them. Counsel said that defendant told him the letters were personal, requested that he not read them, and asked him to bring the letters to him in jail. When he gave defendant the letters, defendant said, "'[i]f there is anything in them, I'll let you know,'" but defendant never said anything more about them.
> Daniel Russo, an expert criminal defense lawyer, opined in support of the

new trial motion that defendant's counsel had a duty to read the letters despite
defendant's request that he not do so. Russo believed that the letters would have
helped the defense insofar as they revealed J.F's jealousy of defendant, a possible
motive for framing him, and insofar as they suggested that she enjoyed painful
sex. He thought that the "rough" and "aggressive" sexual language in the letters
would have given the jury a very different impression of J.F., who appears from
the transcript to have been a fearful and soft spoken witness at trial. Russo
admitted that the letters contained complaints of abuse by defendant that would
have hurt the defense, and that the letters provided no direct support for
defendant's third party culpability theory. He nevertheless believed that the
letters would have been "devastating" to the prosecution and a "gold mine" for
the defense.

      Defendant testified in support of the new trial motion that he gave
counsel the letters and told him to "read around" their "explicit parts." According
to defendant, counsel got angry when he said this, and gave the letters back to
him. The court did not believe defendant's testimony, and found that defendant
had asked counsel not to read the letters.

(Lodged Doc. E at 4–5 (alteration in original).) Proceeding to the first *Strickland* prong, the

California Court of Appeal concluded that trial counsel's performance was not deficient. (*Id.* at

5.) It was within the trial court's discretion to credit counsel's testimony that Meeks both

instructed him not to read the letters and assured him that he would share anything useful

therein. (*Id.*) Moreover, even if he was obligated to investigate the letters, the state court

refused to find trial counsel "incompetent for delegating that task to defendant in accordance

with defendant's wishes." (*Id.*) With respect to the second *Strickland* prong, the Court of

Appeal found it "not reasonably probable" that admission of the letters would have changed the

outcome. (*Id.*) The state court reasoned that the letters would have prejudiced the defense by

providing ample evidence of Meeks's jealous nature and his cruelty toward J.F. (*Id.* at 5–6.) In

addition, as an expression of "J.F.'s love of and desire for" Meeks, the letters "would only have

underscored the cruelty of what befell her and substantially weakened [Meeks]'s defense." (*Id.*

at 6.) Finally, the state court noted with respect to J.F.'s alleged masochistic tendencies that "the

letters suggest at most that she may have enjoyed rough sex, not that she would have invited

anything approaching the torture defendant inflicted on her." (*Id.*)

      The California Court of Appeal's decision is not based on an unreasonable determination

of the facts. A determination of a factual issue by a state court is presumed correct, and the

petitioner has the burden of rebutting the presumption of correctness by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1). Meeks has offered nothing that might call the trial court's

1    credibility determination into question.

2         The California Court of Appeal's decision is also a reasonable application of the

3    *Strickland* standard for ineffective assistance.  The United States Supreme Court set out in

4    *Strickland* the scope of trial counsel's duty to investigate.  Specifically, the Court held that

5    "counsel has a duty to make reasonable investigations or to make a reasonable decision that

6    makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  As in any case in

7    which ineffective assistance is asserted, the "decision not to investigate must be directly

8    assessed for reasonableness in all the circumstances, applying a heavy measure of deference to

9    counsel's judgments." *Id.*  Of particular relevance are the statements and actions of the

10   defendant.  "Counsel's actions are usually based, quite properly, on informed strategic choices

11   made by the defendant and on information supplied by the defendant." *Id.*  In particular, "when

12   a defendant has given counsel reason to believe that pursuing certain investigations would be

13   fruitless or even harmful, counsel's failure to pursue those investigations may not later be

14   challenged as unreasonable." *Id.*

15        Meeks instructed trial counsel not to read the love letters from J.F., and further informed

16   trial counsel that he would pass along any pertinent information.  Meeks chose not to inform

17   either trial counsel or the superior court that he considered portions of the letters pertinent to his

18   defense until after the jury started deliberations.  Moreover, trial counsel had no reason to

19   believe that these love letters would contain any evidence relevant to creating reasonable doubt

20   that Meeks assaulted and tortured J.F., particularly since they were written prior to the attacks at

21   issue in the instant case.

22        In support of his assertion that trial counsel's failure to read the love letters nonetheless

23   constituted deficient performance, Meeks cites only *Rompilla v. Beard*, 545 U.S. 374 (2005), for

24   the proposition that "defense counsel has a duty to investigate even in specific defiance of his

25   client's instruction's [sic]."  But *Rompilla* stands for no such thing.  Rather, the United States

26   Supreme Court there held that trial counsel's performance was deficient "because they failed to

27   make reasonable efforts to review the prior conviction file, despite knowing that the prosecution

28   intended to introduce [the defendant]'s prior conviction not merely by entering a notice of

1    conviction into evidence but by quoting damaging testimony." *Id.* at 389.  Although the Court

2    noted in passing that the defendant in *Rompilla* was uninterested in helping his case and at times

3    even obstructed counsel's efforts on his behalf, *id.* at 381, it did so only to establish that counsel

4    failed to discover mitigating evidence through the defendant that would have been readily

5    apparent had they reviewed his prior conviction file, *id.* at 390–91.  Nothing whatsoever in

6    *Rompilla* suggests that the defendant instructed trial counsel not to examine the prior conviction

7    file.

8            Furthermore, after reviewing J.F.'s love letters, this Court agrees with the California

9    Court of Appeal that Meeks has failed to show a reasonable probability that the result of his trial

10   would have been different had the letters been entered into evidence.  First, while J.F. does

11   accuse Meeks of having previously cheated on her, the letters do not come close to suggesting

12   that J.F. was "deranged by bitterness and jealousy."  To the contrary, the letters show that J.F.

13   loved Meeks and was dedicated to maintaining their relationship despite his then-incarceration.

14   Second, the letters also show that, even prior to the events at issue in this case, Meeks had

15   repeatedly accused J.F. of cheating on him, possessed a bad temper, and verbally abused J.F.

16   Third, the change in J.F.'s demeanor from the time she wrote the letters to her appearance in

17   court only serves to underscore the traumatic experiences she experienced at Meeks's hands in

18   that interim.  Finally, nothing in the letters even remotely suggests that J.F. would be inclined to

19   consent to the treatment she suffered at Meeks's hands on November 20 and 21, 2003.

20           Therefore, the state court decision rejecting Meeks's claim of ineffective assistance of

21   counsel based on failure to use the love letters was not contrary to nor an unreasonable

22   application of clearly established federal law, nor was it based on an unreasonable determination

23   of the facts in light of the evidence in the record before this Court.

24           *C.*      *Motion to Reopen*

25           Meeks claims that he suffered ineffective assistance of counsel because his attorney

26   failed to make a motion to reopen the case after Meeks expressed his desire to testify.  "The

27   right to testify on one's own behalf at a criminal trial has sources in several provisions of the

28   Constitution.  It is one of the rights that 'are essential to due process of law in a fair adversary

1    process.'" *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) (quoting *Faretta v. California*, 422 U.S.

2    806, 819 n.15 (1975)).

3         On direct review, the California Court of Appeal accurately described the background to

4    this claim as follows:

5              According to the trial minutes, the case went to the jury at 2:30 p.m. on
         April 2, 2004, the jury deliberated until 5:00 p.m. that day, and the case was
6        recessed to April 7.  On April 7, defendant made a *Marsden* motion, claiming
         among other things that he told counsel before the defense rested that he wanted
7        to testify, but that counsel did not call him as a witness.  Counsel said that he had
         a different recollection of his discussions with defendant, and the court denied
8        the *Marsden* motion.
              At the hearing on the new trial motion, trial counsel testified that
9        defendant had been "pretty adamant" about not wanting to testify, and that
         defendant confirmed that decision before the defense rested at the close of the
10       prosecution's case.  Counsel could think of no reason why he did not move to
         reopen the defense case after learning at the *Marsden* hearing that defendant
11       wanted to take the stand.  Defendant reiterated at the new trial hearing that he
         told counsel at trial that he wanted to testify.  Defendant said counsel was
12       originally concerned that the jury would learn of his prior offenses if he testified,
         but they agreed he would have little to lose by testifying if the court denied his
13       motion in limine to exclude evidence of his Washington offenses against J.F.,
         which he indicated were his only violent priors.  Thus, when the motion to
14       exclude the Washington priors was denied, he thought that he would be able to
         take the stand.  [Expert criminal defense lawyer] Russo admitted that it was very
15       unusual to move to reopen a case during jury deliberations, but opined that
         defendant's trial counsel was ethically obligated to make that motion at the
16       *Marsden* hearing upon learning of defendant's desire to testify.
              When the [trial] court denied the new trial motion, it called defendant a
17       "controlling" and "manipulative" person.  The court found "no evidence that
         [defendant] wanted to testify, that [trial counsel] said no, he's not going to
18       testify."

19   (Lodged Doc. E at 6–7 (alterations in original) (internal footnotes omitted).)  The Court of

20   Appeal then rejected Meeks's claim of ineffective assistance of counsel based on failure to enter

21   a motion to reopen the case so that Meeks might testify.  This conclusion was not contrary to

22   federal law.

23        Proceeding to the first *Strickland* prong, the California Court of Appeal concluded that

24   trial counsel's performance was not deficient.  (*Id.* at 7.)  This Court agrees.  The trial court

25   found that Meeks never asked to testify during the trial itself, and Meeks has offered no

26   evidence to rebut the presumption of correctness afforded this factual finding.  (Lodged Doc. C5

27   at 74.)  Furthermore, Meeks merely indicated at the *Marsden* hearing that he had "*wanted* to get

28   on the stand."  (Lodged Doc. A1 at 219 (emphasis added).)  Because Meeks gave no indication

1   that he still wanted to testify even though the jury had already begun deliberating, counsel's

2   failure to enter a motion to reopen cannot be considered deficient.

3       With respect to the second *Strickland* prong, the California Court of Appeal found it "not

4   reasonably probable" that a motion to reopen would have changed the outcome of the

5   proceedings.  (Lodged Doc. E at 7.)  Again, this Court agrees.  A trial court has "broad

6   discretion" under California law in determining whether to reopen a case, and in making this

7   determination considers, *inter alia*, the stage of the proceedings at the time of the motion and

8   the moving party's diligence in presenting new evidence.  *People v. Cuccia*, 118 Cal. Rptr. 2d

9   668, 674 (Cal. Ct. App. 2002) (citations omitted).  Given that the jury was midway through its

10  deliberation when Meeks expressed his desire to testify at the *Marsden* hearing, the Court of

11  Appeal correctly concluded that the trial court would "likely have declined" to reopen Meeks's

12  case.  (Lodged Doc. E at 7–8.)

13      Meeks argues that such a conclusion "is tantamount to a claim that the trial court's

14  discretion does not extend to granting a motion to reopen once deliberations have begun."  Not

15  so.  Had Meeks offered a convincing explanation for his tardy request, or had his desired

16  testimony been significant, the outcome of his hypothetical motion to reopen might well have

17  been different.  But Meeks's reference to the quick pace of the trial is unconvincing, and as the

18  Court of Appeal noted, there is no "record of what the evidence from [Meeks]'s testimony would

19  have been or what its significance was."  (*Id.* at 8.)

20      Therefore, the state court decision rejecting Meeks's claim of ineffective assistance of

21  counsel based on failure to enter a motion to reopen the case so that Meeks might testify was

22  neither contrary to nor an unreasonable application of clearly established federal law, nor was it

23  based on an unreasonable determination of the facts in light of the evidence in the record before

24  this Court.

25  II.   *Confrontation*

26      Meeks contends that his Sixth Amendment right to confront the witnesses against him

27  was violated because he was unable to see J.F. as she testified during his trial.  The California

28  Court of Appeal accurately described the background to this claim as follows:

1
2
3
4
5
6
7
8

At the outset of J.F.'s trial testimony, defense counsel stated that he could not see her, the court asked her to "sit up closer," and counsel said that he could see her after she moved.  Shortly thereafter, counsel again reported that he could not see J.F., and the prosecutor remarked, "It's clear [J.F. is] trying to stay somewhat hidden."  Counsel had to move his chair in order see [sic] J.F.  After the parties rested and before the jury arguments, counsel indicated for the record that defendant had been unable to see the faces of the witnesses when they testified.  "I did not realize this during testimony," counsel explained, "[Defendant] told me after the close of evidence."  The court responded, "All right.  We'll have the record reflect that [defendant] was present in the courtroom, sitting at the counsel table during the entire case."  Defendant then stated that counsel "knows I did say something."  Defendant said he did not know whether he was allowed to move to see the witnesses, and had not wanted to appear "unruly" in the courtroom.  The court said, "All right.  All right.  Well, we made the record."

9    (*Id.* at 8 (alterations in original).)  The Court of Appeal then rejected Meeks's confrontation

10   claim on the basis that he failed to raise a timely objection with the trial court.  (*Id.* at 8–9

11   (citing *People v. Mitcham*, 824 P.2d 1277, 1289 (Cal. 1992) ("Absent a timely and specific

12   objection on the ground defendant now asserts on appeal, his contention is deemed waived."); *In*

13   *re Jermaine B.*, 81 Cal. Rptr. 2d 734, 741–42 (Cal. Ct. App. 1999)).)  It further noted that the

14   ninety minutes of testimony from the prosecution's two witnesses provided ample opportunity

15   for complaint.  (*Id.* at 9.)

16       State courts may decline to review a claim based on a procedural default.  *See generally*

17   *Wainwright v. Sykes*, 433 U.S. 72 (1977).  As a general rule, a federal habeas court "will not

18   review a question of federal law decided by a state court if the decision of that court rests on a

19   state law ground that is independent of the federal question and adequate to support the

20   judgment."  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  A state rule must be

21   "independent" in that it is not "interwoven with the federal law."  *Park v. California*, 202 F.3d

22   1146, 1152 (9th Cir. 2000) (quoting *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983)).  A

23   state rule is "adequate" if it is "well-established and consistently applied."  *Bennett v. Mueller*,

24   322 F.3d 573, 583 (9th Cir. 2003) (citing *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999)).

25       If the applicable state rule is independent and adequate, the claim may be reviewed by

26   the federal court only if the petitioner can show: (1) "cause for the default and actual prejudice

27   as a result of the alleged violation of federal law"; or (2) "that failure to consider the claims will

28   result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  "'Cause' is a

1   legitimate excuse for the default, and 'prejudice' is actual harm resulting from the alleged

2   constitutional violation." *Thomas v. Lewis*, 945 F.2d 1119, 1123 (9th Cir. 1991) (citation

3   omitted).  "[T]he miscarriage of justice exception is limited to those *extraordinary* cases where

4   the petitioner asserts his innocence and establishes that the court cannot have confidence in the

5   contrary finding of guilt." *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008) (citing *Schlup*

6   *v. Delo*, 513 U.S. 298, 317 (1995)).

7          The disposition of Meeks's confrontation claim by the California Court of Appeal clearly

8   rests on his procedural error in failing to raise this constitutional issue before the trial court in a

9   timely manner.  The Ninth Circuit has recognized California's timely objection requirement as

10  an independent and adequate state law ground for decision. *Davis v. Woodford*, 384 F.3d 628,

11  654 (9th Cir. 2004).  Meeks does not deny that neither he nor trial counsel timely complained to

12  the trial court of Meeks's alleged inability to see J.F. as she testified.  Nor has he asserted

13  specific factual allegations demonstrating the inadequacy of California's timely objection rule as

14  inconsistently applied or not well-established, either as a general rule or as applied to him. *See*

15  *Bennett*, 322 F.3d at 586.

16         Moreover, Meeks has also failed to demonstrate that there was cause for his procedural

17  default.  "A showing of cause must ordinarily turn on whether the prisoner can show that some

18  objective factor external to the defense impeded [his] efforts to comply with the State's

19  procedural rule." *Robinson v. Ignacio*, 360 F.3d 1044, 1052 (9th Cir. 2004) (internal quotation

20  omitted).  "Thus, cause is an external impediment such as government interference or reasonable

21  unavailability of a claim's factual basis." *Id.* (citation omitted).  Although Meeks contends that

22  he complained to trial counsel of his inability to see J.F. as soon as there was a meaningful

23  opportunity for him to do so, and that he did not move his chair because he did not want the

24  court officers to think him unruly, he cites no "external impediment" explaining his failure to

25  say "me, too" when trial counsel twice complained of being unable to see J.F.

26         Nor has Meeks demonstrated that a failure to consider this claim will result in a

27  "fundamental miscarriage of justice."  To qualify for this exception, Meeks must show that "a

28  constitutional violation has probably resulted in the conviction of one who is actually innocent."

-13-

*Murray v. Carrier*, 477 U.S. 478, 496 (1986).  While Meeks claims innocence, "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eye-witness accounts, or critical physical evidence—that was not presented at trial."  *Cook v. Schriro*, 538 F.3d 1000, 1028 (9th Cir. 2008) (quoting *Schlup*, 513 U.S. at 324).  The only such evidence Meeks presents are the love letters sent to him by J.F.  But, for the same reasons explained *supra*, these letters fail to establish a probability that Meeks is actually innocent.

The Court is therefore precluded from considering the merits of Meeks's confrontation claim.

*III.     Great Bodily Injury*

Finally, Meeks claims a violation of his Fourteenth Amendment due process right to be convicted by evidence that proves his guilt beyond a reasonable doubt.  Specifically, Meeks contends that insufficient evidence supports the jury's finding of great bodily injury as elements of counts I, II, and VI as well as their enhancements.  He first argues that "the bruising to the thighs and the burn to the neck and hand" suffered by J.F. as a result of being attacked with the heated hanger and lit cigar "were no more than moderate injuries."  He further alleges that the California Court of Appeal impermissibly considered J.F.'s choking injuries in finding no due process violation.

The Due Process Clause of the Fourteenth Amendment guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  The United States Supreme Court has held that in determining whether to grant habeas relief on a claim of insufficient evidence, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

-14-

1   beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In so doing, the

2   federal court must refer to the substantive elements of the criminal offense as defined by state

3   law.  *Id.* at 324 n.16.  Moreover, AEDPA requires that a federal court "apply the standards of

4   *Jackson* with an additional layer of deference"—namely, whether the state court decision

5   "reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts."  *Juan H.*, 408 F.3d

6   at 1274–75.

7        California law defines "great bodily injury" as "a significant or substantial physical

8   injury."  Cal. Penal Code § 12022.7(f).  Whether a victim has suffered great bodily injury is a

9   question of fact for the jury.  *People v. Cross*, 190 P.3d 706, 710 (Cal. 2008).  The California

10  Supreme Court has described "great bodily injury" as "a substantial injury *beyond* that inherent

11  in the offense."  *People v. Escobar*, 837 P.2d 1100, 1103 (Cal. 1992).  But "to be significant or

12  substantial the injury need not be so grave as to cause the victim 'permanent, prolonged, or

13  protracted' bodily damage."  *Cross*, 190 P.3d at 711 (quoting *Escobar*, 837 P.2d at 1106)

14  (internal quotation marks omitted).  Nor are "medical complications or the use of force . . .

15  required to support a finding of great bodily injury."  *Id.*  Rather, such a finding "rests on the

16  facts as presented at trial in the context of the particular crime and the particular injuries

17  suffered by the victim."  *Id.* (citing *Escobar*, 837 P.2d at 1106).  In particular, great bodily injury

18  "is commonly established by evidence of the severity of the victim's physical injury, the

19  resulting pain, or the medical care required to treat or repair the injury."  *Id.* at 712 (citations

20  omitted).  "A fine line can divide an injury from being significant or substantial from an injury

21  that does not quite meet the description.  Where to draw that line is for the jury to decide."  *Id.* at

22  710 (internal quotation and citations omitted).

23       Meeks first argues that J.F.'s non-choking injuries were merely "moderate."  At trial, the

24  nature and severity of J.F.'s injuries was established by the prosecution using three sources:

25  (1) photographs taken immediately following the assaults and two weeks later; (2) testimony

26  from J.F.; and (3) testimony from Dr. Stephen Backman, who examined J.F. when she arrived at

27  the hospital.  Admittedly, Dr. Backman's testimony alone may not establish the substantial

28

nature of J.F.'s non-choking injuries.  With respect to the wire hanger assault, Dr. Backman characterized the resultant injury as a bruise rather than a burn, and indicated that he believed the bruise "would resolve of its own accord." (Lodged Doc. C4 at 80, 84.)  Furthermore, although Dr. Backman indicated that "[t]here were ointments put on the burn" from the lit cigar, he declined to characterize it as "particularly serious." (*Id.* at 83–84.)

However, the jury also heard J.F.'s testimony describing how Meeks inflicted the non-choking injuries.  J.F. testified about the wire hanger incident as follows:

> Q.  When you took your pants off, what happened?
> A.  He took the metal hanger that was in the closet and burnt it.  Then he whacked me on the legs with it twenty times.
> . . .
> Q.  Now, when you say he heated up the hanger, what do you mean by that?  Can you explain that?
> A.  He took the lighter, he was burning the middle part.
> Q.  Was it hot when it hit you?
> A.  Yes.
> Q.  And had he done anything to manipulate the hanger, or was it still in the hanger form?
> A.  No, he broke it up and made it long.
> Q.  Kind of straightened it out?
> A.  Yes.
> Q.  So, approximately how many times did he hit you with the hanger?
> A.  Like about 20 times.
> Q.  Did you receive any injuries as a result of being hit with the hanger?
> A.  I had marks on my legs.
> Q.  Did you have any burns?
> A.  Yes.

(*Id.* at 37–39.)  With respect to the lit cigar, J.F. testified:

> Q.  Do you remember whether or not he was smoking a cigar at any time?
> A.  Yes.
> Q.  What happened with that?
> A.  He burned me on my neck.
> Q.  When you say burned you on your neck?
> A.  He killed it on my neck.

Q.  He killed it, he put it out?

A.  Yes.

Q.  How did that feel?

A.  It was hurting.

Q.  Did he burn you anywhere else with the cigar?

A.  Yes, on my hand.

(*Id.* at 47.)  The jury also saw photographs establishing that the bruising and burns caused by the wire hanger and lit cigar lasted at least two weeks.  (*Id.* at 54, 56; People's Exs. Nos. 8, 10.)  Viewing all of the evidence, as it must, in the light most favorable to the prosecution, the Court concludes that a rational trier of fact could have found beyond a reasonable doubt that J.F.'s injuries from the heated wire hanger and from the lit cigar were, independently, substantial and not merely moderate.  *See People v. Jung*, 84 Cal. Rptr. 2d 5, 9 (Cal. Ct. App. 1999) ("Abrasions, lacerations, and bruising can constitute great bodily injury.").

Meeks also claims that the opinion of the California Court of Appeal is "fundamentally flawed" because it "found the required substantial evidence [of great bodily injury] . . . only by merging the injuries together rather than analyzing the evidentiary support individually" for the non-choking injuries.  Because the California prosecutor filed independent assault and torture counts based on the beating with the heated wire hanger, the prolonged choking, and the burning with the lit cigar, great bodily injury must be established independently for each.  Interpreting substantive California law, the Court of Appeal concluded on direct review that sufficient evidence supported the jury's findings of great bodily injury for the non-choking injuries under California's Penal Code, noting that "the jurors saw the photos of blood in the victim's eyes two weeks after the violent choking."  (Lodged Doc. E at 10.)  Meeks is correct in asserting that this evidence is irrelevant with respect to whether J.F.'s injuries from the heated wire hanger and lit cigar constitute great bodily injuries under section 12022.7(f) of the California Penal Code.  However, the California Court of Appeal cited J.F.'s bloody eyes merely as an "example" of the sufficiency of the evidence.  As explained *supra*, viewing all of the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt

that the bruising on J.F.'s thighs and the burns on her neck and hand independently constituted great bodily injury.

Thus, the decision of the California Court of Appeal rejecting Meeks's claim of insufficient evidence for great bodily injury from the non-choking assaults was neither contrary to nor an unreasonable application of *Jackson* and *Winship*.

<u>EVIDENTIARY HEARING</u>

If a habeas applicant has failed to develop the factual basis for a claim in state court, an evidentiary hearing may not be held in federal court unless (1) the claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicate that could not have been previously discovered through the exercise of due diligence"; and (2) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).  Meeks's claims rely on established rules of constitutional law.  Further, Meeks has not set forth any factual basis for his claims that could not have been previously discovered by due diligence.  Finally, the facts underlying Meeks's claims are insufficient to establish that no rational factfinder would have found him guilty of the crimes with which he was charged.  Therefore, Meeks is not entitled to an evidentiary hearing.

Therefore, it is hereby

**ORDERED** that Meeks's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DISMISSED IN PART** and **DENIED IN PART**.  The case is **DISMISSED** with prejudice.

The Clerk is directed to enter the accompanying Judgment and to send uncertified copies of this Order and the Judgment to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 22nd day of October, 2009.


/s/ Richard C. Tallman
UNITED STATES CIRCUIT JUDGE
Sitting by designation